**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| GLASS, LEWIS & CO., LLC,<br><br>Plaintiff,<br><br>v.<br><br>GENTNER DRUMMOND, *in his official capacity as Attorney General of Oklahoma*,<br><br>Defendant. | Case No.: 5:26-CV-02382-PRW |

**PLAINTIFF'S REPLY IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

**CROWE & DUNLEVY, PC**
Randall J. Yates, OBA #30304
222 North Detroit Avenue, Suite 600
Tulsa, OK 74120
(918) 592-9866
(918) 592-9801 (fax)
randall.yates@crowedunlevy.com

**YETTER COLEMAN LLP**
Bryce L. Callahan*
bcallahan@yettercoleman.com
Grant B. Martinez*
gmartinez@yettercoleman.com
Lily E. Hann*
lhann@yettercoleman.com
Austin T. Brumbaugh*
abrumbaugh@yettercoleman.com
Jared LeBrun*
jlebrun@yettercoleman.com
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (fax)

* admitted pro hac vice

# TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 1

I. THE ACT VIOLATES THE FIRST AMENDMENT. .......... 1

A. The Act engages in facial viewpoint discrimination. .......... 2

1. Discriminating against an entire class of viewpoints is still viewpoint discrimination. .......... 2

2. A specific example helps illustrate the Act's viewpoint bias. .......... 4

3. *Reagan National* does not negate viewpoint discrimination. .......... 5

B. The Act is subject to strict scrutiny. .......... 6

1. Viewpoint discriminatory laws require at least strict scrutiny .......... 6

2. It does not matter that the Act refrains from prohibiting speech because bans and burdens require the same scrutiny. .......... 7

3. Slapping a (misplaced) "securities" label on proxy advice does not lower the level of scrutiny. .......... 8

II. THE REMAINING FACTORS SUPPORT GLASS LEWIS, AND SEVERANCE IS UNWARRANTED. .......... 10

CONCLUSION .......... 10

## INTRODUCTION

As the Supreme Court reminded us earlier this year, the First Amendment "safeguards not only popular ideas; it secures, even and especially, the right to voice dissenting views." *Chiles v. Salazar*, 607 U.S. 627, 646 (2026). The Attorney General's lead defense is that the Act is viewpoint-neutral because it burdens *all* dissent from management while "an advisor that sides with management owes nothing regardless of its reasons." Resp. 1-2, 9. Burdening expression of *all* dissenting views does not redeem the Act—it makes the viewpoint discrimination *worse*. The government "has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992).

The Attorney General never tries to meet his burden to defend the Act under strict scrutiny, the minimum standard that applies. So, Glass Lewis is likely to succeed on the merits, and the remaining preliminary injunction factors favor an injunction.

## ARGUMENT

### I. The Act violates the First Amendment.

The Attorney General makes undeveloped, mistaken arguments about the applicable standards. *First*, he mentions a heightened preliminary-injunction standard, but that does not apply here: Oklahoma "may fully enforce" the law if Glass Lewis loses after trial. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 798 n.3 (10th Cir. 2019).

*Second*, he observes that the burden on the Act's constitutionality does not shift to the government until Glass Lewis shows that the Act burdens protected speech, Resp. 7-8, but Glass Lewis did exactly that, and he does not argue otherwise. *See* Mot. 2-6, 12-13;

ECF 8-30 ¶¶ 4-6, 36-48; *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."). And the government always bears the burden to justify a law *compelling* speech, even under *Zauderer*. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 776 (2018) (*NIFLA*) ("Importantly, California has the burden to prove").

**A. The Act engages in facial viewpoint discrimination.**

Glass Lewis' motion showed that the Act, in its text, engages in facial viewpoint discrimination. Mot. 9-11. The Attorney General's arguments otherwise lack merit.

**1. Discriminating against an entire class of viewpoints is still viewpoint discrimination.**

The Attorney General mistakenly argues that "H.B. 4429 is content- and viewpoint-neutral" because it does not "punish speech about any particular subject or with any particular viewpoint" and is "triggered by 'anti-ESG' proxy advisors and 'pro-ESG' proxy advisors alike." Resp. 8-9. *First*, the Attorney General just ducks the proper framing of the relevant viewpoint: the Act's requirements are triggered (only) by the expression of the particular viewpoint that "you should not vote with management on this proposal." H.B. 4429 § 4(A), (B). He never explains why that is not a viewpoint nor shows that the Act operates neutrally with respect to that viewpoint. The Indiana district court rejected this same argument for the same reason. *See ISS v. Rokita*, 838 F. Supp. 3d 849, 858 (S.D. Ind. 2026) ("Defendant's argument misstates the relevant viewpoint.").

*Second*, the Supreme Court and Tenth Circuit have rejected the Attorney General's narrow conception of viewpoint discrimination—as involving only discrimination against

a single, specific viewpoint on a single, specific topic. Instead, "viewpoint covers more than an individual's ideology or ideas on a particular subject matter—viewpoint includes the perspective of the speaker[.]" *Utah Political Watch, Inc. v. Musselman*, 179 F.4th 1241, 1257 (10th Cir. 2026). The Act burdens the perspective of dissenting from management.

Importantly, discriminating "against an entire class of viewpoints" is still viewpoint discrimination. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831-32 (1995). Indeed, the Act's discriminating against *many* viewpoints—the "entire class of viewpoints" recommending various clients vote against management on various proposals—makes the Act worse, not better. As *Rosenberger* explained, "exclusion of several views . . . is just as offensive to the First Amendment as exclusion of only one . . . . [T]he debate is skewed in multiple ways." *Id.* at 831-32; *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring) ("To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so.").

Both courts "use the term 'viewpoint' discrimination in a broad sense"; "government action that applies 'evenhandedly' to 'both sides of every possible issue' may still be viewpoint-based[.]" *Utah Political*, 179 F.4th at 1257 (quoting *Matal*, 582 U.S. at 243 (Alito, J., plurality op.)). *Matal* showed how broad that sense was:

> To be sure, the clause evenhandedly prohibits disparagement of all groups. It applies equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue. It denies registration to any mark that is offensive to a substantial percentage of the members of any group. But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint.

*Matal*, 582 U.S. at 243 (Alito, J.). In *Iancu v. Brunetti*, the Court again deployed its broad

sense of the term "viewpoint"—juxtaposing expression of ideas that accord with, and those that defy, "society's sense of decency or propriety." 588 U.S. 388, 394 (2019).

If "[g]iving offense is a viewpoint," *Matal*, 582 U.S. at 243 (Alito, J.), then surely so is "you should not vote with management on this proposal." The Act's text burdens the entire class of messages expressing that viewpoint, but not the class with the opposite view. H.B. 4429 § 4(A), (B). That is facial viewpoint discrimination.

**2. A specific example helps illustrate the Act's viewpoint bias.**

A specific example of Glass Lewis' actual proxy advice helps illustrate the Act's operation and the flaws in the Attorney General's viewpoint-neutrality arguments.

In 2024, Glass Lewis produced a Proxy Paper on Chevron's annual meeting. ECF 8-7. Glass Lewis agreed with Chevron's board on every proposal but one: a shareholder proposal about additional tax transparency reporting. The board recommended voting "AGAINST," but Glass Lewis recommended voting "FOR." *Id.* at 1-2. In five pages of detailed analysis, Glass Lewis explained why it recommended voting for the proposal, why tax transparency issues pose regulatory and reputational risks for a global company like Chevron, and why additional reporting might therefore help its shareholders better assess the company's tax-related risks. *Id.* at 48-52. Glass Lewis did not purport to quantify the "short-term and long-term financial benefits and costs." H.B. 4429 § 3(10).

Consider how the Act would operate if this report were provided "to any person in" Oklahoma in November 2026. *Id.* § 3(7). Glass Lewis' first 18 recommendations would not trigger the Act's burdens *because* Glass Lewis expressed agreement with management. But the last recommendation would trigger the Act's burdens *because* Glass Lewis

expressed a dissenting view. *Id.* § 4(A), (B). Solely for saying that Glass Lewis' clients should not vote with Chevron's board, the Act would impose burdens and exposure to civil and criminal penalties. *Id.* §§ 4(A), 4(B), 5(A). If it said the opposite view—no burdens.

Those burdens are significant. Merely because Glass Lewis' analysis did not state "the experience and geographic location of the personnel who formed the recommendation," it would have been required to tell its clients, Chevron, and anyone visiting Glass Lewis' website that it "has made the recommendation or policy without doing so based on a written financial analysis regarding the impact of that recommended action on company investors." *Id.* §§ 3(10), 4(A). For this one recommendation, backed by five pages of analysis but not the government-dictated analysis, Glass Lewis would have to keep the self-shaming statement on its website *in perpetuity*. *Id.* § 4(A)(3) ("While such services are being provided"). Glass Lewis disagrees with these messages and would not broadcast them without the threat of government penalties. ECF 8-30 ¶¶ 42-48.

Thus, on its face, the Act imposes significant burdens based solely on the viewpoint expressed. It does so for an entire class of views. That is facial viewpoint discrimination.

### 3. ***Reagan National*** **does not negate viewpoint discrimination.**

The Attorney General's reliance on *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), is misplaced because that case did not involve viewpoint-based discrimination. Resp. 8-9, 19. That law's "provisions distinguish based on location: A given sign is treated differently based *solely* on whether it is located on the same premises as the thing being discussed or not." *Reagan Nat'l*, 596 U.S. at 71 (emphasis added). "A sign's substantive message itself is irrelevant to the application of the

provisions." *Id. Reagan National* upheld Austin's location-based sign rules because the distinction is "agnostic as to content," "requires an examination of speech only in service of drawing neutral, location-based lines," and does "not single out any topic or subject matter for differential treatment." *Id.* at 69-71.

Here, the "substantive message itself" is not "irrelevant to the application" of the Act; rather, its burdens entirely depend on whether Glass Lewis conveys "vote with management" or "don't vote with management." The district court in Kansas rejected this *exact* argument. *See ISS v. Kobach*, 2026 WL 1815236, at *7 n.9 (D. Kan. 2026); *see also Brown v. Kemp*, 86 F.4th 745, 780-82 (7th Cir. 2023) (rejecting *Reagan Nat'l* argument).

**B. The Act is subject to strict scrutiny.**

**1. Viewpoint-discriminatory laws require at least strict scrutiny.**

The Attorney General mistakenly suggests that less-than-strict scrutiny could apply to viewpoint-discriminatory laws if they regulate commercial speech. Resp. 15. If any "question remains open," *id.*, it does not involve applying lesser scrutiny; rather, the debate on viewpoint discrimination asks whether it is *always* "per se invalid" or should get the slim chance to survive strict scrutiny.[1] Although the Attorney General quibbles with one of Glass Lewis' many authorities—*Sorrell*—he never explains why *Chiles*, *Iancu*, *Turner Broadcasting*, and *Animal Legal* do not establish a categorical rule that viewpoint discrimination always requires at least strict scrutiny. Mot. 13-14 & n.3. Nor could he.

[1] *See* Mot. 14 n.3 (collecting authorities); *Planned Parenthood Great Nw. v. Comm'r of the Ind. State Dep't of Health*, 187 F.4th 939, 968 (7th Cir. 2026) (Scudder, J., concurring); *Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 756 (6th Cir. 2025) (en banc).

*Chiles* removes all doubt: where a plaintiff "cannot voice certain perspectives the State disfavors when speaking with consenting clients," "viewpoint restrictions like that are not subject to mere rational-basis review or intermediate scrutiny." 607 U.S. at 646 (quotation marks and alteration omitted). Here, the Act burdens only certain perspectives when speaking to highly sophisticated, consenting clients. ECF 8-30 ¶¶ 7-10.

In *R.A.V.*, Justice Scalia indicated that viewpoint discrimination in commercial speech is not permitted: "a State may choose to regulate price advertising in one industry . . . because the risk of fraud . . . is in its view greater there. But a State *may not* prohibit only that commercial advertising that depicts men in a demeaning fashion." 505 U.S. at 388-89 (citations omitted; emphasis added). The Attorney General does not cite any case holding that lesser scrutiny *should* or *must* apply to a viewpoint-discriminatory law.

**2. It does not matter that the Act refrains from prohibiting speech because bans and burdens require the same scrutiny.**

The Attorney General relies heavily on a foreclosed argument: that the Act "forbids nothing," but "merely requires certain . . . disclosures." Resp. 11; *see* Resp. 1 ("prohibits nothing"); Resp. 4 ("does not restrict"); Resp. 13 (same); Resp. 23 (same).

This argument is foreclosed by *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000). There, the Court explained: "It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Id.* at 812. Thus, it "is of no moment" that the Act does not *restrict* the expression of "you should not vote with management on this

proposal," but only *burdens* it with compelled speech (government-dictated analysis or self-disparagement) or civil and criminal penalties. Quite simply, a "State cannot advance some points of view by burdening the expression of others." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (quotation marks omitted). That is exactly what the Act does.

Relatedly, the Attorney General's attempt to save the Act by observing that Glass Lewis can engage in counter-speech—Resp. 1, 6, 11, 13, 16, 23—is also foreclosed. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 15-16 & n.11 (1986) (plurality op.).

**3. Slapping a (misplaced) "securities" label on proxy advice does not lower the level of scrutiny.**

The Attorney General suggests that the Act regulates "commercial disclosures in the securities industry" and so gets only rational basis review. Resp. 11-14. But there is no "securities" exception to the First Amendment's prohibition on viewpoint discrimination.

*First*, laws "obviously repugnant to the First Amendment[] should not face relaxed review just because [the government] used the 'securities' label." *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014), *adhered to on reh'g*, 800 F.3d 518 (D.C. Cir. 2015) (*NAM*); *Kobach*, 2026 WL 1815236, at *10. "The First Amendment is no word game," and its protections cannot be "nullified by 'mere labels.'" *Chiles*, 607 U.S. at 645 (citation omitted). "[D]iscrete traditions of content-based regulations cannot be aggregated together to sustain some new and broader category of lesser-protected speech." *Id.* at 651.

*Second*, proxy *statements* and other disclosures by public issuers are meaningfully different from third-party proxy *advice* by Glass Lewis. Unlike proxy statements, proxy

advice has not been subject to a history of regulation: "Proxy-voting advice rendered by a third party for a fee falls outside [the Exchange Act of 1934]. It is simply a recommendation." *ISS v. SEC*, 142 F.4th 757, 768 (D.C. Cir. 2025). Unlike those soliciting votes or getting paid to promote a stock, "*disinterested* . . . advice will still qualify for full First Amendment protection." *United States v. Wenger*, 427 F.3d 840, 848 (10th Cir. 2005). In shareholder democracy, proxy statements are made by those campaigning—soliciting votes for their own self-interest. By contrast, Glass Lewis is not a party to votes, is not asking for anyone's vote, has no stake in the outcome, and speaks only to clients who hired it, often evaluating the proposal with the client's own chosen criteria. ECF 8-30 ¶¶ 4-5, 15, 20-21, 23, 27-28, 31. The Act's definition of "proxy advisory services" reinforces that it does not regulate solicitation, but advice, analysis, and research. *See* H.B. 4429 § 3(7).

*Third*, none of the Attorney General's cases support a lower standard here. *Ohralik v. Ohio State Bar Association* is a lawyer-solicitation case that predates the entire proxy-advice industry. 436 U.S. 447, 456 (1978). Its stray reference to "corporate proxy statements" was dicta, citing a case that does not address the First Amendment in any way. *Id.* (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 377-97 (1970)). The Supreme Court has "since emphasized that *Ohralik*'s 'narrow' holding is limited to conduct that is inherently conducive to overreaching and other forms of misconduct." *Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, 551 U.S. 291, 296-98 (2007).

*Wall Street Publishing* and *AT&T* only seem helpful to the Attorney General because his brief omits limiting language. Both deal with "speech relating to the purchase and sale of securities," but his brief omits the words "purchase and sale of." *See* Resp. 11,

13 (quoting *SEC v. Wall St. Publ'g Inst.*, 851 F.2d 365, 373 (D.C. Cir. 1988); *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022)). The D.C. Circuit has since counseled: "To read *Wall Street Publishing* broadly would allow [the government] to easily regulate otherwise protected speech using the guise of securities laws." *NAM*, 748 F.3d at 372. Instead, it should be read narrowly, as limited to "inherently misleading speech employed to sell securities." *Id.* (cleaned up). And *AT&T* declined strict scrutiny only because the law did "not implicate expressions of opinion or points of view." 626 F. Supp. 3d at 750.

Thus, the Act's viewpoint discrimination is dispositive: it triggers strict scrutiny, and the Attorney General, who bears the burden, does not argue that the Act can survive it.

## II. The Remaining Factors Support Glass Lewis, and Severance Is Unwarranted.

The Attorney General's arguments on the remaining factors assume the Act's constitutionality; he does not dispute that the factors *support* a preliminary injunction *if* the Court concludes the Act is likely unconstitutional. *See* Mot. 23-25; *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc), *aff'd*, 573 U.S. 682 (2014). His factual assertions on the remaining factors are conclusory and unsupported. His severance argument lacks merit because severance is "premature" at this stage. *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 773 (5th Cir. 2025). Even if it were not, he does not explain how severance is possible without fundamentally changing the Act, which depends entirely on a viewpoint-discriminatory trigger. *See Keenan v. Russ*, 588 P.3d 156, 175-176 (Okla. 2025); *Kobach*, 2026 WL 1815236, at *9.

## CONCLUSION

Glass Lewis asks the Court to enter the preliminary injunction requested.

Dated: October 5, 2026

Respectfully submitted,

**CROWE & DUNLEVY, PC**
Randall J. Yates, OBA #30304
222 North Detroit Avenue, Suite 600
Tulsa, OK 74120
(918) 592-9866
(918) 592-9801 (fax)
randall.yates@crowedunlevy.com

**YETTER COLEMAN LLP**

*/s/ Bryce L. Callahan*
Bryce L. Callahan*
bcallahan@yettercoleman.com
Grant B. Martinez*
gmartinez@yettercoleman.com
Lily E. Hann*
lhann@yettercoleman.com
Austin T. Brumbaugh*
abrumbaugh@yettercoleman.com
Jared LeBrun*
jlebrun@yettercoleman.com
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (fax)

* admitted pro hac vice

**CERTIFICATE OF SERVICE**

I certify that on October 5, 2026, a copy of this document will be served on counsel of record via the Court's electronic filing system.

*/s/ Jared LeBrun*
Jared LeBrun